

**ORDERED in the Southern District of Florida on July 26, 2023.**

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Case No. 18-23941-BKC-RAM |
| SAM INDUSTRIAS S.A., BOULDER PARTICIPACOES, LTDA, and DANIEL BENASAYAG BIRMANN, | Chapter 15 |
| Debtors. | |

**ORDER GRANTING IN PART AND DENYING IN PART**
**THE FOREIGN REPRESENTATIVE'S SECOND MOTION**
**TO COMPEL PRODUCTION FROM WITHERS AND WIGGIN**

To resolve the pending discovery motion in this chapter 15 case, the Court must determine whether certain documents submitted for *in camera* review are protected by the attorney-client privilege and, if so, whether the Court should order the production of these

1

otherwise privileged documents under the crime-fraud exception to the attorney-client privilege.

## Introduction

This chapter 15 case relates to the Brazilian bankruptcy case of three debtors: two business entities, SAM Indústrias S.A. ("SAM") and its parent company, Boulder Participações, Ltda. ("Boulder), and the principal of those businesses, Daniel Bensayag Birmann ("Daniel Birmann," and together with SAM and Boulder, the "Debtors"). Their foreign main bankruptcy case is an involuntary liquidation (the "Brazilian Case").

Carlos Magno, Nery e Medeiros Sociedade de Advogados, the foreign representative of the Debtors' bankruptcy estates (the "FR") seeks to compel production of documents from an American lawyer, Bruce Hood, Esq., and from two American law firms at which Mr. Hood worked. Mr. Hood provided legal services to Daniel Birmann personally and to certain entities that Mr. Birmann controlled. Mr. Hood also served as an officer or managing partner of several Birmann-controlled entities.

The motion to compel raises two issues regarding the discovery targets' claims of attorney-client privilege. First, are the subject communications privileged at all, or were some of the communications non-privileged business advice provided by Mr. Hood as an officer or managing member of the entities subject of the advice? Second, even if the targets established that the privilege

applies, should the Court compel production of the documents under the crime-fraud exception to the attorney-client privilege?

As discussed herein, the Court finds that Mr. Hood and the American law firms established that the documents at issue are protected by the attorney-client privilege.  However, the Court also finds that the crime-fraud exception to the attorney-client privilege applies to certain communications in furtherance of Daniel Birmann's fraudulent and likely criminal attempt to transfer and conceal his assets.  Specifically, Mr. Hood's legal advice helped Daniel Birmann establish and administer a trust created after the commencement of the Brazilian Case to unlawfully put his assets out of the reach of the creditors in the Brazilian Case.  The trust and orders entered in the Brazilian Case expressly finding that Daniel Birmann fraudulently concealed his assets will be discussed in greater detail below.  As will be shown, the FR has satisfied his burden to prove that the crime-fraud exception applies to several otherwise privileged communications.

## Factual Background

On January 8, 2007, a creditor of SAM, Fundação de Seguridade Social Braslight ("Braslight"), commenced the Brazilian Case by filing an involuntary bankruptcy petition with the Second Business Court of the City of Rio de Janeiro (the "Brazilian Court"), seeking to liquidate SAM and to extend SAM's liquidation to both Boulder and Daniel Birmann. [DE #2-1, pp.3-4, 34-35; DE #219, p.5].

The Brazilian Court granted Braslight's request and, on February 27, 2008, ordered the liquidation of SAM and extended the liquidating bankruptcy decree to Boulder and to Daniel Birmann. [DE #2-1, pp.19-38] (the "Brazilian Bankruptcy Decree").  The extension order meant that all of Boulder's assets and Daniel Birmann's assets became assets of the Brazilian bankruptcy estates.

The Brazilian Bankruptcy Decree describes an investigation of the Debtors' affairs that was conducted by the Brazilian Securities Exchange Commission ("CVM").  That investigation concluded with the CVM imposing, on March 30, 2005, "the highest fine of its history." [DE #2-1, p.33].  The Brazilian Court found that the CVM's findings and conclusions were "trustworthy, not only because of the recognized value of the work of this institution [*i.e.*, the CVM], but also because the defendants [*i.e.*, the Debtors] never denied in this action [*i.e.*, the Brazilian Case] any of the occurrences mentioned in the [CVM's] administrative decision." [DE #2-1, p.36].  Those occurrences indicate that Daniel Birmann abused his majority ownership interest in Boulder to improperly loot SAM. [DE #2-1, pp.36-37].

The Brazilian Court describes Daniel Birmann as having "bled [SAM] dry" by causing SAM to enter into intercompany loan agreements with Boulder. *Id*.  In turn, Boulder used the loan proceeds to make additional intercompany loans to Banco Arbi S.A.

("Banco Arbi"), a bank in which Boulder held an approximately 80% ownership interest and in which SAM held an approximately 10% ownership interest. *Id*. Those loans were highly unfavorable to SAM. *Id*. The amounts loaned were excessive, amounting to 95.58% of SAM's net worth, and the term for repayment was indefinite. *Id*.

The Brazilian Court found that Daniel Birmann abused his powers as the controlling shareholder of SAM for the following reasons:

> [A]t the expense of [SAM's] funds, of its minority shareholders and creditors, the 2nd defendant [*i.e.*, Daniel Birmann] bled the 1st defendant [*i.e.*, SAM] dry, which was changed into a bank of a single client, which resulted in its situation of illiquidity. As if that were not enough, the money lent to the controlling shareholder, the 3rd defendant [*i.e.*, Boulder], and transferred to Banco Abri [sic], was paid to the 1st defendant [*i.e.*, SAM] in shares, rather than in cash, as it was lent. Said attitude represents a serious abuse of the controlling shareholder [*i.e.*, Boulder] . . . .

*Id*.

In addition to extending SAM's liquidation to Daniel Birmann and Boulder, the Brazilian Bankruptcy Decree forbade Daniel Birmann from transferring or encumbering his assets. [DE #2-1, p.37]. After entering the Brazilian Bankruptcy Decree, in orders and judgments described below, the Brazilian Court found that Daniel Birmann transferred his assets and used his family members, the trust, and offshore companies to conceal his assets. The FR has filed actions in Brazil and in the Cayman Islands to recover

some of those assets, and the Brazilian Court has entered judgment in the FR's favor in at least one such turnover proceeding.

Specifically, the FR prevailed in an adversary proceeding filed in Brazil seeking turnover of shares in Companhia Brasileira de Cartuchos ("CBC"). After entering a preliminary injunction on October 31, 2018 [DE #19-1], on January 21, 2020, the Brazilian Court entered a judgment (the "CBC Judgment") in favor of the FR finding that Daniel Birmann illegally transferred the CBC shares and nullifying the transfer of the shares that occurred after the filing of the Brazilian Case.[1]  In the CBC Judgment, the Brazilian Court noted that the Birmann family admits to being wealthy and having significant assets in a family trust that was administered by Daniel Birmann, "the only member of this rich family entity, without any asset in his name." [DE #93, p.10].  The Brazilian Court found further that "[t]he use of family members and the structuring of offshores to shield and conceal the bankrupt's [*i.e.*, Daniel Birmann's] assets is evident, allowing his business activities to be exempt from liabilities that can at least be characterized as temerarious management." *Id*.  The Brazilian Court identified, in particular and among others, Daniel Birmann's

---

[1] The FR filed a copy of the CBC Judgment in a Notice of Filing dated February 13, 2020 at DE #93.  An English translation of the CBC Judgment is found at DE #93, pp.4-14.

sister, Miriam Benasayag Birmann, as a family member in whose name Daniel Birmann is known to conceal assets. *Id.*

The timing of the creation of The Fiduciaire De La Famille M & M Benasayag STAR Trust (the "Trust"), the way the Trust has been used, and the Brazilian Court's findings regarding the Trust are critical to this Court's conclusion that several of the communications at issue were in furtherance of creating and funding the Trust to fraudulently shield Daniel Birmann's assets from the reach of the Debtors' creditors. The Trust was established on October 4, 2007,[2] approximately nine months after Braslight filed an involuntary bankruptcy petition against Daniel Birmann and less than five months prior to issuance of the Brazilian Bankruptcy Decree. Daniel Birmann transferred significant corporate ownership interests to the Trust, including $30.7 million worth of shares of BT Global Investments Ltd.,[3] and 100% of the membership interests in Brookmont Trading LLC and in South America Logistics LLC, both Delaware limited liability companies.[4] Even after removing himself "from future benefit under the Trust" on October 3, 2011,[5] Daniel Birmann continued to transfer several corporate

---

[2] *See* Declaration of Trust [DE #219-3].

[3] *See* Deed of Addition of Property dated October 5, 2007 [DE #219-5].

[4] *See* Deeds of Donation dated August 16, 2010 [DE #219-8].

[5] *See* Deed of Exclusion and Designation of Beneficiaries dated October 3, 2011 [DE #219-9] (demonstrating that Daniel Birmann removed himself as a beneficiary of the Trust and made his mother, Rahma Raquel Benasayag Birmann, and son, Bernardo Simoes Birmann, the new beneficiaries of the Trust).

ownership interests to the Trust.[6]  Daniel Birmann parted with his assets purportedly for his sister Miriam's ultimate benefit. Miriam replaced Daniel Birmann as enforcer of the Trust on October 3, 2013,[7] and became the sole beneficiary of the Trust on March 31, 2015.[8]  On that same date, the Trust was terminated, and all the Trust assets were transferred to Miriam.[9]

The record in the Brazilian Case, including the Brazilian Bankruptcy Decree, the CBC Judgment, and the foregoing Trust transactions, establishes a *prima facie* case that Daniel Birmann created the Trust as part of a fraudulent, if not criminal, scheme to place his assets beyond the reach of his creditors after the commencement of the Brazilian Case.  The Brazilian Court found "that this family trust is actually used to remove the assets from the name of individuals, shielding the family's assets from a

---

[6] *See* Deeds of Donation dated April 19, 2012, May 30, 2012, June 12, 2012, September 11, 2012, and January 12, 2013 [DE #219-10] (demonstrating that throughout 2012 and early 2013 Daniel Birmann transferred to the Trust 100% of the membership interests in the following entities in which Daniel Birmann owned or controlled, directly or indirectly: Anaconda Group LLC, a Delaware limited liability company; CBC Europe Sarl, a Luxembourg limited liability company; Charquinn LLC, a Delaware limited liability company; Rogerdale International LLC, a Delaware limited liability company; Rayvera LLC, a Delaware limited liability company; and Gruet LLC, a Delaware limited liability company.

[7] *See* Deed of Nomination, Resignation and Appointment of Enforcer dated October 3, 2013 [DE #219-12].

[8] *See* Deed of Disclaimer dated March 31, 2015 [DE #219-13] and Deed of Addition of Beneficiary dated March 31, 2015 [DE #219-13] (demonstrating that Miriam replaced Rahma and Bernardo as the sole beneficiary of the Trust).

[9] *See* Deed of Direction, Discharge and Release dated March 31, 2015 [DE #219-13] (demonstrating that Miriam directed the trustee "to appoint the whole of the Trust Fund to Miriam absolutely freed and discharged from the trusts, powers and provisions of the Trust").

potential misfortune in its business ventures[.]" [DE #93, p.10].[10]

In the CBC Judgment, the Brazilian Court also describes Daniel
Birmann's improper use of corporate holding structures to conceal
his beneficial ownership interests in corporate equity and assets.
[DE #93, pp.11-13].[11]

## **Procedural History**

On November 8, 2018, the FR filed a chapter 15 petition for
recognition of the Brazilian Case as a foreign main proceeding [DE
#1].  The Court granted recognition by order dated December 10,
2018 [DE #8].

In June 2019, the FR served discovery requests on Bruce E.
Hood, Esq. ("Bruce Hood") and the two law firms whose objections
are at issue in this contested matter.  Specifically, on June 12,
2019, the FR issued a Notice of Rule 2004 Examination (documents
only) to Bruce Hood [DE #77], which Notice the FR re-issued to
Bruce Hood on June 25, 2019 [DE #82]. On June 14, 2019, the FR
issued Notices of Rule 2004 Examinations (documents only) to Wiggin
& Dana LLP ("Wiggin") and to Withers Bergman, LLP ("Withers") [DE

---

[10] A more detailed description of the corporate holding structure and Daniel
Birmann's use of his son, ex-wife, and mother, in addition to his sister Miriam,
in concealing his assets is contained in in the FR's Second Motion to Compel
[DE #219].

[11] The CBC Judgment also stated that "[t]he attempt to hide the assets through
unofficial donations is also clearly demonstrated, such as the donation of 100%
of the shares of Brookmont Trading Corporation to the family trust 'The
Fiduciaire de La Famille M&M Benasayag Star Trust", made in 2010 by a public
deed." [DE #93, p.12]

##79 and 80].  On February 14, 2020, the FR issued a new Notice of Rule 2004 Examination (documents only) to Bruce Hood [DE #95].

After what he described as incomplete responses, the FR moved to compel production from Bruce Hood, Wiggin, and Withers (collectively, the "Respondents").  Specifically, on February 21, 2020, the FR filed the first Motion to Compel Production of Documents by Hood, Withers, and Wiggin [DE #98] (the "First Motion to Compel").  On April 16, 2020, the Respondents and CBC Ammo LLC and CBC Global Ammunition LLC filed responses in opposition to the First Motion to Compel [DE ##116 and 117].  The FR filed a reply on April 21, 2020 [DE #120].

On April 23, 2020, the Court conducted a hearing on the First Motion to Compel.  By order dated June 16, 2020, the Court granted in part and denied in part the First Motion to Compel [DE #125]. That Order required production of "all non-privileged documents responsive to the [FR's] document requests" and required Respondents to file a privilege log for all documents withheld based on a claim of attorney-client privilege. [DE #125, p.5].

On May 19, 2020, the FR issued new Notices of Rule 2004 Examination (documents only) to the Respondents [DE ##122, 123, and 124].  The FR served amended document requests on Wiggin and on Withers on June 24, 2020 [DE ##129 and 130].  On August 3, 2020, the FR served its First Set of Interrogatories on Bruce Hood [DE #139].  Thereafter, document production ensued under the

protection of a confidentiality agreement between the FR, Bruce Hood, and Wiggin [DE ##147 and 148].

On September 29, 2020, the FR filed a motion to set a status conference to address outstanding discovery issues and the status of the Brazilian Case [DE #151]. The FR filed a Status Report on November 5, 2020 [DE #169], to which the Respondents filed a response on November 11, 2020 [DE #177]. On November 12, 2020, the Court conducted a status conference. At the status conference, the parties updated the Court on recent events in the Brazilian Case and stated that they were productively engaged in document production and in negotiations to resolve outstanding discovery issues. No ruling was requested at the time, although the parties previewed that they may need judicial intervention in the future.

On June 29, 2021, the FR issued a Re-Notice of Bankruptcy Rule 2004 Examination of Bruce Hood [DE #211], seeking to depose and to obtain document production from Bruce Hood.

On August 2, 2021, the FR filed the Second Motion to Compel Production of Documents by Withers and Wiggin [DE #219] (the "Second Motion to Compel"), which motion gave rise to the contested matter presently before the Court. The Respondents filed a Memorandum of Law in Opposition to the Second Motion to Compel on September 29, 2021 [DE #249]. The FR filed a Reply in Support of Second Motion to Compel on October 22, 2021 [DE #258] (the "FR

Reply"). On November 3, 2021, the Court conducted a hearing on the Second Motion to Compel.[12]

On November 8, 2021, the Court entered an Order Granting, in Part, and Setting Further Briefing and Other Deadlines on the Foreign Representative's Second Motion to Compel Production from Withers and Wiggin [DE #267]. That Order set a deadline for Withers and Wiggin to file a sur-reply and to submit documents to the Court for *in camera* review because, as the Court was advised at the November 3, 2021 hearing, only a small subset of the documents at issue in the Second Motion to Compel were still the subject of a contested claim of privilege (the "Withheld Documents"). All other relief requested in the Second Motion to Compel was resolved by agreement or was otherwise moot.

On November 19, 2021, the Respondents filed a Sur-Reply to the Second Motion to Compel [DE #276] and emailed the Court a copy of the Withheld Documents requiring *in camera* review. This procedure is appropriate where the parties contest the applicability of the attorney-client privilege to particular documents. *See, e.g., In re Grand Jury Proceedings #5*, 401 F.3d 247, 253 (4th Cir. 2005); *Clarke v. Am. Com. Nat. Bank,* 974 F.2d 127, 129 (9th Cir. 1992). Thereafter, the Court took this contested matter under advisement.

---

[12] The findings and conclusions in this Order supersede any inconsistent observations or comments by the Court at the November 3rd hearing.

## Discussion

In determining whether to compel production of the Withheld Documents, the Court must first determine whether U.S. or Brazilian privilege law applies.  Federal Rule of Bankruptcy Procedure 2004 generally governs the appropriate scope of discovery requests propounded under that rule, even when such requests are propounded in a chapter 15 case that is ancillary to a foreign main proceeding. *In re SAM Industrias, S.A.*, No. 18-23941-BKC-RAM, 2019 WL 1012790, at *4, 2019 Bankr. LEXIS 677 at *12 (Bankr. S.D. Fla. Mar. 1, 2019) (citing *In re Petroforte Brasileiro de Petrolea Ltda.*, 542 B.R. 899, 911 (Bankr. S.D. Fla. 2015)).  The general rule, however, does not always apply to claims of privilege, which may be governed by foreign law even if asserted in the context of a discovery request propounded under Rule 2004. *See Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 64-65 (S.D.N.Y. 2010) (discussing the "touch base" test applicable in the Second Circuit).

Nonetheless, domestic privilege law applies to this contested matter because an American lawyer is providing services that relate to both foreign and domestic Birmann-controlled entities. Moreover, the parties' pleadings assume that domestic privilege

law applies,[13] and the Court cannot find otherwise when there is no other country that has a more compelling interest in the communications. Although foreign legal proceedings and the creation of foreign trusts and holding structures are discussed, American counsel was retained for purposes of overseeing a global asset management strategy involving the Trust, and the Trust assets include shares in domestic corporations.

Under U.S. law, the attorney-client privilege protects all confidential communications that occur between attorneys and their clients regarding legal advice. *Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1175 (C.D. Cal. Mar. 28, 2022) ("*Eastman I*"). The Respondents bear the initial burden of proving the following essential elements of attorney-client privilege:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [a] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

---

[13] A separate issue is the law that governs the underlying fraud or crime. On this point, the parties agree that Brazilian law would govern. *See* FR Reply, DE #258 at p.2.

*In re Grand Jury Proceedings 88-9*, 899 F.2d 1039, 1042 (11th Cir. 1990) (quotations omitted).

The FR argues that the Respondents have failed to establish that some of the Withheld Documents are privileged at all because it is unclear who the client is in some of the emails and because, as described earlier, Bruce Hood was both counsel and an officer or managing partner in several of Daniel Birmann's entities. Upon review of the Withheld Documents, the Court finds that the communications did contain legal advice and are protected by the attorney-client privilege unless the crime-fraud exception applies.

The crime-fraud exception extinguishes both the attorney-client privilege and the work product doctrine, and "applies when (1) a client consults an attorney for advice that will help them in the commission of a fraud or crime, and (2) the communications are sufficiently related to and were made in furtherance of the crime," regardless of whether the scheme was even successful. *Eastman v. Thompson*, Case No. 8:22-cv-00099-DOC-DFM, 2022 WL 11030550, at *8, 2022 U.S. Dist. LEXIS 192764 at *16 (C.D. Cal. Oct. 19, 2022) ("*Eastman II*") (internal quotations omitted). This exception "applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct." *Id*. (internal quotations omitted). The crime-fraud exception is not a recent doctrine. The Supreme Court applied the exception nearly

a century ago.  In 1933, the Supreme Court held that "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933).

The crime-fraud exception has been applied to communications regarding fraudulent transfers that show an intent to defraud an individual or entity, even when the actual crime has not been committed yet. *See e.g.*, *Carbajal v. Hayes Mgmt. Serv. Inc.*, Case No. 4:19-cv-00287-BLW, 2022 WL 2869205, 2022 U.S. Dist. LEXIS 130744 at *49 (D. Idaho July 21, 2022) (citing cases in support). The crime-fraud exception can also apply to communications between an attorney and another attorney representing the same client regarding the client's legal matters depending on its relation to the potential fraud or crime. *In re Warner*, 87 B.R. 199, 202 (Bankr. M.D. Fla. 1988).

The party seeking disclosure must make a *prima facie* case that communications between an attorney and a client, or between attorneys, were for an unlawful purpose or that they demonstrate a future unlawful activity, without having to "conclusively prove the elements of the purported crime or fraud." *In re Andrews*, 186 B.R. 219, 222 (Bankr. E.D. Va. 1995) (citing *X Corp. v. Doe*, 805 F. Supp. 12298, 1306 (E.D. Va. 1992)).  The movant must show that the client had the intent of committing a fraud or crime. *Id*. (*citing Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of*

*Emerson Elec. Co.*, 953 F.2d 1004, 1008 (5th Cir. 1992)).  The movant does not have to prove that the attorney had knowledge of the crime for the exception to apply; the exception relies on a showing of the client's intent, not the attorney's intent. *Gutter v. E.I. Dupont de Nemours*, 124 F. Supp. 2d 1291,1298 (S.D. Fla. 2000) (*citing United States v. Soudan*, 812 F.2d 920, 927 (5th Cir. 1986)).

As discussed earlier, U.S privilege law applies and under U.S law, documents otherwise protected under the attorney-client privilege must be produced if the communications were in furtherance of a crime or fraud that was likely committed by the client, in this case, Daniel Birmann.  Although the Court must apply U.S. law in analyzing whether the crime-fraud exception applies, the findings that this Court must derive from the Brazilian Case must be findings establishing a *prima facie* case of crime or fraud under Brazilian law.

The FR argues that Daniel Birmann's creation of the Trust was criminal under Chapter VII of the Brazilian Bankruptcy Law,[14] as described in the Sworn Declaration of Marcelo Lucidi that is

---

[14] The Respondents argue that the FR failed to identify the crimes at issue and the country whose law criminalizes the conduct at issue.  The Court rejects that argument.  The pleadings demonstrate that the FR is not relying solely on a classic claim of fraudulent transfer.  Rather, the FR has argued that Daniel Birmann committed crimes in Brazil by fraudulently concealing his assets to avoid administration of those assets by the Brazilian Court, among other crimes. The particular bankruptcy crimes at issue are described in the above synopsis of the Lucidi Declaration.

attached as Exhibit 1 to the FR's Reply in Support of Second Motion to Compel [DE #258-1] (the "Lucidi Declaration").  Mr. Lucidi is a licensed Brazilian attorney and represents the FR in the Brazilian Case.  In the Lucidi Declaration, Mr. Lucidi identifies Brazilian bankruptcy laws that criminalize the following conduct: (1) engaging in fraud to secure an undue advantage for oneself or for others either prior to or after issuance of a bankruptcy decree, (2) misleading creditors or the bankruptcy court by making false statements or material omissions, (3) concealing or diverting a debtor's assets, (4) illegally acquiring, receiving, or using property of the bankruptcy estate, or inducing a third-party to engage in such activity, and (5) failing to comply with mandatory accounting obligations [DE #258-1, pp.2-4, ¶4].

The FR has the burden to establish that Daniel Birmann sought legal advice for purposes of committing bankruptcy crimes or fraud. The FR must satisfy a two-part test.  First, the FR must make a *prima facie* showing that Daniel Birmann

> was engaged in criminal or fraudulent conduct when he sought the advice of counsel, . . . was planning such conduct when he sought the advice of counsel, or . . . committed a crime or fraud subsequent to receiving the benefit of counsel's advice.  Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987) (citations omitted).  If the FR carries his burden, the

crime-fraud exception applies, and the communications at issue are not protected from disclosure by attorney-client privilege.

In determining whether the crime-fraud exception applies here, the Court finds guidance in three recent U.S. District Court decisions: *Carbajal*, 2022 WL 2869205, 2022 U.S. Dist. LEXIS 130744 (D. Idaho July 21, 2022), *Eastman I*, 594 F. Supp. 3d 1156 (C.D. Cal. Mar. 28, 2022), and *Eastman II*, 2022 WL 11030550, 2022 U.S. Dist. LEXIS 192764 (C.D. Cal. Oct. 19, 2022).

In *Carbajal*, the plaintiff argued that the defendant's transfer of assets was a fraudulent conveyance and, therefore, that the communications relating to the sale fell under the crime-fraud exception. *Carbajal* 2022 U.S. Dist. LEXIS 130744 at *48. The District Court found that the defendant entered into a transaction as part of a fraudulent scheme to conceal the defendant's assets from the plaintiff to avoid paying any potential judgment in the plaintiff's favor. *Id.* at *52. The defendant sold its assets for an inadequate purchase price to its principal's daughter and a longtime employee while the District Court litigation was pending and immediately after the District Court denied the defendant's motion for summary judgment. *Id.* The defendant concealed the transactional documents and, in doing so, made false or misleading statements to the plaintiff, the plaintiff's lawyer, and the District Court. *Id.* at *53.

The District Court held that the foregoing facts, among other things, established sufficient "badges of fraud," such as the sale to a close relative, to raise a presumption of fraudulent intent. *Id.* at *54.  Therefore, in finding that the first prong of the crime-fraud exemption was met (*i.e.*, client consults an attorney for advice that will serve them in the commission of a fraud or crime), the District Court found it "more likely than not" that the defendant entered into the transactions with the wrongful intent to conceal assets from the plaintiff to avoid any potential judgment against it in the case. *Id.*; *see also In re Andrews,* 186 B.R. at 224 (inference that transfers may have been fraudulent was sufficient to apply crime-fraud exception).  The District Court also found that the communications were "sufficiently related to" and made "in furtherance of" the fraud, satisfying the second prong of the crime-fraud exception. *Id.*  The email communications furthered the fraudulent scheme; the defendant's principal, his daughter and the longtime employee retained counsel to paper the transactions, and each of the communications reflect a "necessary step" toward the accomplishment of the fraudulent scheme." *Id.* at *55.  The District Court concluded that the communications were a "direct nexus" to the potential fraud. *Id.*  Because both prongs of the crime-fraud exception were met, the defendant was ordered to produce the documents. *Id.* at **55-56.

The *Eastman I and Eastman II* cases involved emails between Former U.S. President Donald J. Trump and Dr. John Eastman ("Dr. Eastman") during Dr. Eastman's tenure as a law professor at Chapman University. The documents were subpoenaed by the House of Representatives Select Committee to Investigate the January 6, 2021 Attack on the U.S. Capitol (the "Select Committee"). In *Eastman I*, Dr. Eastman asserted the attorney-client privilege and work product protection in withholding certain documents and filed a complaint in the U.S. District Court for the Central District of California seeking a declaratory judgment to prevent Chapman University from complying with the subpoena. *Eastman I*, 594 F. Supp. 3d at 1167. In connection with that lawsuit, 111 documents were submitted to the District Court for *in camera* review. *Id*. Of the 111 documents, the District Court found that none of the documents were protected by attorney-client privilege but that eleven (11) of the documents were protected work product. *Id*. at 1175-87. The District Court then examined each of the eleven documents at issue to determine whether the documents fell under the crime-fraud exception. *Id*. at 1187-97. In its opinion, the District Court used the term "protected documents" to refer to the documents that were found to have been protected work product prior

to considering the application of the crime-fraud exception. *Id.* at 1187.[15]

In *Eastman* 1, the District Court found that it was "more likely than not that President Trump corruptly attempted to obstruct the Joint Session of Congress on January 6, 2021," *id.* at 1193, and that it was "more likely than not that President Trump and Dr. Eastman dishonestly conspired to obstruct the Joint Session of Congress on January 6, 2021." *Id.* at 1196. Accordingly, the District Court found evidence to support two crimes, obstruction of an official proceeding in violation of 18 U.S.C. §1512(c)(2) and conspiracy to defraud the United States in violation of 18 U.S.C. §371. *Id.* at 1189-95.

The District Court then addressed the second issue, whether the eleven documents were "in furtherance of" the two crimes. *Id.* at 1195. The District Court found that only one document, an email forwarded to Dr. Eastman containing a draft memo that knowingly violated the Electoral Count Act, was "intimately related to and clearly advanced the plan to obstruct the Joint Session of Congress on January 6, 2021." *Id.* at 1196-97. Therefore, the District Court concluded that "[b]ecause the memo likely furthered the crimes of obstruction of an official proceeding and conspiracy to defraud

---

[15] The crime-fraud exception extinguishes both the attorney-client privilege and the work product doctrine. *Eastman I*, 594 F. Supp. 3d at 1188. Accordingly, *Eastman I*'s application of the crime-fraud exception to protected work product is relevant to this Court's application of the crime-fraud exception to documents protected under attorney-client privilege.

the United States, it is subject to the crime-fraud exception" and, therefore, it must be disclosed. *Id.* at 1197.

In *Eastman II*, the same District Court found that an additional 536 documents were protected either by work product or attorney-client privilege and, therefore, analyzed each of the 536 documents to determine whether any fell under the crime-fraud exception. *Eastman II*, 2022 U.S. Dist. LEXIS 192764 at *16. As described above, the District Court had previously found that President Trump was more likely than not engaged in or planning an obstruction of an official proceeding and a conspiracy to defraud the United States when he sought advice from Dr. Eastman. *Id.* at **16-17. The District Court then addressed whether the additional 536 documents fell under the crime-fraud exception by determining whether they were "sufficiently related to" and made "in furtherance of" said crimes. *Id.* at *17.

The District Court held that the crime-fraud exception did not apply to eighteen emails related to ongoing or prospective litigation in key battleground states. *Id.* at **17-18. The District Court found that although those eighteen emails were "sufficiently related" to disrupting the January 6th vote, it could not conclusively determine that these emails furthered the obstruction of the January 6, 2021 congressional proceedings. *Id.* at *18. However, the District Court found that the crime-fraud exception applied to four other emails, "in which Dr. Eastman and

other attorneys suggested that . . . the primary goal of filing [certain lawsuits] is to delay or otherwise disrupt the January 6 vote," because the emails were sufficiently related to and in furtherance of the obstruction crime. *Id.* at **18-19. Finally, the District Court found that the crime-fraud exception applied to four additional emails related to and in furtherance of the conspiracy to defraud the United States because they "demonstrate an effort by President Trump and his attorneys to press false claims in federal court for the purpose of delaying the January 6 vote." *Id.* at *19. Regarding these emails, the District Court found that "the emails show that President Trump knew that the specific numbers of voter fraud were wrong but continued to tout those numbers, both in court and to the public." *Id.* at **20-21.

### Determining Whether the Crime-Fraud Exception Applies to the Withheld Documents Will Not Infringe on the Brazilian Court's Jurisdiction

The Respondents argue that applying the crime-fraud exception to any of the Withheld Documents would require this Court to make findings of fact that would violate principles of comity and be contrary to the ancillary role U.S. bankruptcy courts should perform in chapter 15 cases. *See* DE #249, pp. 16-20.

The Respondents' argument fails because this Court does not need to make a finding on the merits of a crime or fraud to apply the crime-fraud exception to the attorney-client privilege. Rather, the FR must simply make a *prima facie* showing that Daniel

Birmann was engaged in or planning to engage in criminal or fraudulent behavior when he sent or received emails with counsel that comprise most of the Withheld Documents. *In re Grand Jury Investigation*, 842 F.2d at 1226; *Gutter*, 124 F. Supp. 2d at 1303-09; *In re Grand Jury Proceedings #5*, 401 F.3d at 251 ("In satisfying this prima facie standard, proof either by a preponderance or beyond a reasonable doubt of the crime or fraud is not required.").

In fact, in the crime-fraud exception cases discussed earlier, the client in the attorney-client communications had not been convicted, or even indicted for a crime, or had a judgment entered against him or her for fraud.  For example, in *Eastman I* and *Eastman II*, discussed above, the District Court applied the crime-fraud exception not based on a criminal conviction or even an indictment of President Trump, but rather based on a record establishing that President Trump was "more likely than not" engaged in or planning an obstruction of an official proceeding and a conspiracy to defraud the United States when he sought legal advice from Dr. Eastman.  *Eastman I*, 594 F.Supp. 3d at 1193, 96; *Eastman II*, 2022 U.S. Dist. LEXIS 192764 at **16-17; *see also Carbajal*, 2022 U.S. Dist. LEXIS 130744 at **54-55 (applying crime-fraud exception based on a finding that it was "more likely than not" that the defendant entered into a fraudulent transaction to conceal assets).

### The Crime-Fraud Exception Applies to Attorney to Attorney Communications Without Proof of Misconduct by Counsel

Communications between attorneys representing the same client or between an attorney and paralegal representing the same client are also subject to scrutiny under the crime-fraud exception. *In re Warner*, 87 B.R. at 202. Moreover, it is the client's intentions and knowledge that matter. The party seeking discovery does not need to show that the attorney or other agent was aware of the client's illegal or fraudulent intent. *In re Grand Jury Proceedings #5*, 401 F.3d at 251 ("When applying the crime-fraud exception to the attorney-client privilege, we have held that it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege."); *Gutter*, 124 F. Supp. 2d at 1298 ("The application of this exception is primarily controlled by the client's intent – it is unnecessary to show that the attorney had actual or constructive knowledge of the crime.").

The Respondents argue that the exception cannot be applied to communications between attorneys (or between attorney and paralegal) absent allegations of wrongdoing by the attorney, relying on both the *Warner* case and the *Grand Jury Proceedings #5* case cited above. The Court rejects this argument because the need to demonstrate attorney misconduct was discussed in both cases in connection with the work-product privilege, not the attorney-client privilege. *See In re Grand Jury Proceedings #5,* 401 F.3d at

252 ("Thus, while the attorney-client privilege may be vitiated without showing that the attorney knew of the fraud or crime, those seeking to overcome the opinion work product privilege must make a prima facie showing that the attorney in question was aware of or a knowing participant in the criminal conduct.") (internal quotations omitted); *In re Warner*, 87 B.R. at 203 ("The Court further concludes that the Committee is not entitled to the production of any documents which fall within the scope of the work product privilege . . . or which reflect [the attorney's] mental impressions, conclusions, opinions, or legal theories developed in connection with this case.").

The Respondents have not satisfied their burden of establishing that the work-product doctrine bars production of any of the Withheld Documents. The Respondents' Memorandum of Law in Opposition to the FR's Second Motion to Compel [DE #249] does not mention work product. It was raised for the first time in the Respondents' Sur-Reply at DE #276, which includes brief argument that one of the Withheld Documents constitutes work product in only one section of the Sur-Reply [DE #276, p.8].

Work product protection only applies to documents prepared in anticipation of litigation or for trial. Fed. R. Civ. Pro. 26(b)(3); *Eastman* II, 2022 U.S. Dist. LEXIS 192764 at *7. The Respondents do not advance any meaningful argument that any of the Withheld Documents were prepared in anticipation of litigation.

Because work product protection is not applicable, the Court concludes that the crime-fraud exception may be applied here to attorney to attorney (or paralegal) communications without demonstrating knowledge, or misconduct, by counsel.

### The Record in the Brazilian Case Establishes a *Prima Facie* Case that Daniel Biermann Consulted Bruce Hood for Advice Assisting Him in Committing a Crime or Fraud

Determining whether the crime-fraud exception applies to the Withheld Documents depends on whether the communications between Bruce Hood and/or his paralegal and Daniel Birmann (1) were sufficiently related to crimes, or a fraudulent scheme perpetrated or committed by Daniel Birmann to protect his assets from the creditors in the Brazilian Case, and (2) were in furtherance of the crimes or fraud.

Addressing the first element, in the CBC Judgment, the Brazilian Court recognized that Daniel Birmann engaged in a "constant practice of concealment and asset shielding," and that one of the ways in which Daniel Birmann hid assets was by donating assets to the Trust [DE #93, pp.12-13]. The Brazilian Court states that an investigative report submitted by the Debtors' bankruptcy estate contains "unequivocal proof that the bankrupt debtor [*i.e.*, Daniel Birmann] has assets abroad and that he has been evading the bankruptcy court[.]" [DE #93, p.10].

Hiding assets from the reach of creditors is fraudulent and likely criminal under Brazilian law. And the record in the

Brazilian case establishes that, more likely than not, Daniel Birmann solicited Bruce Hood's services in furtherance of his fraudulent and likely criminal activities.  Daniel Birmann knew that an insolvency decree would likely be entered against him when he sought Bruce Hood's legal advice and business assistance in the creation of the Trust and in moving assets into the Trust. Moreover, advice Bruce Hood provided in later years relating to the removal of Daniel Birmann as a beneficiary of the Trust, additional asset transfers into the trust, and the eventual termination of the Trust in 2015 all assisted Daniel Birmann in the continuation of his fraudulent scheme. *See United States v. Ballard*, 779 F.2d 287, 293 (5th Cir. 1986) (describing later conversations with counsel as a continuation of the defendant's earlier concealment of assets from his creditors and the Internal Revenue Service).

Braslight filed its involuntary bankruptcy petition against SAM on January 8, 2007. [DE #2-1, pp.3-4; DE #219, p.5].  The Brazilian Court did not enter the Brazilian Bankruptcy Decree until February 27, 2008. [DE #2-1, pp.3-5; DE #219, p.7].  However, when the Bankruptcy Case was filed, the involuntary petition also sought

to extend the bankruptcy to Boulder and Daniel Birmann.[16] [DE #2-1, pp.3-4, 34-35].

The Brazilian Court has found that the Trust was improperly used to conceal assets rather than for legitimate estate-planning purposes. [DE #93, pp.12-13]. In the CBC Judgment, the Brazilian Court states that "the assets of these [Birmann] family members are intertwined in a tangle of offshores and this family [T]rust is actually used to remove the assets from the name of individuals, shielding the family's assets from a potential misfortune in its business ventures, thus avoiding the personal liability of the partners, [and] allowing the irresponsible performance of the company administrator [*i.e.*, Daniel Birmann]." [DE #93, pp.10-11].

Based on those findings and the documents referenced therein and considering the Brazilian bankruptcy crimes outlined in the Lucidi Declaration, this Court finds *prima facie* evidence that Daniel Birmann more likely than not committed Brazilian bankruptcy crimes and/or fraud by creating the Trust, with the assistance of Bruce Hood, to illegally avoid the disclosures and asset-freezes that he knew would be imposed upon entry of the Brazilian Bankruptcy Decree and engaged in further actions relating to the Trust with Bruce Hood's assistance. Therefore, the crime-fraud

---

[16] As described earlier, when a bankruptcy case in Brazil is "extended" to an additional party, the additional party's assets become assets of the bankruptcy estate.

exception applies to all communications relating to the creation, management, use, and dissolution of the Trust to the extent said communications were made in furtherance of the crime or fraud.

## The Crime-Fraud Exception Applies to
## Some, But Not All, of the Withheld Documents

The Court must still determine whether the communications in the Withheld Documents were "sufficiently related to" and "in furtherance" of the crime or fraud. Summarized in brief, the Court finds that the crime-fraud exception applies to communications related to the creation and funding of the Trust, later transfer of assets into the Trust, changes to the Trust's beneficiaries, and the termination of the Trust. Conversely, the crime-fraud exception does not apply to communications that might infer other fraudulent concealment activities by Daniel Biermann, but the inference is too speculative to meet the second "sufficiently related to" and "in furtherance of" prong of the exception.

### Log Entry 1 and 2

Two emails pertaining to the creation of the Trust are at issue,[17] and both emails must be produced.

The first email is dated July 13, 2007 at 2:31 PM. It is from Daniel Birmann and is addressed to Bruce Hood. Betsy Hall, Bruce Hood's paralegal, is in copy. The subject line reads "ENC:

---

[17] The redacted versions are at DE #230, pp. 16-18/168 and are bate stamped WIGGIN000136-WIGGIN000138.

Declaration of Trust." The email describes changes that Daniel Birmann would like to make to the Trust.

The July 13, 2007 email was sent before the Brazilian Court entered the Brazilian Bankruptcy Decree but <u>after</u> Daniel Birmann was on notice from the involuntary petition that his assets would likely become part of the Brazilian bankruptcy estate and be subject to liquidation to pay the Brazilian bankruptcy estate's creditors. The Court finds that the first email dated July 13, 2007 at 2:31 PM is sufficiently related to and was made in furtherance of Daniel Birman's fraudulent scheme and, therefore, must be produced.

In addition to producing the July 13, 2007 email, the Respondents must also produce the other document at issue in Log Entry 1 and 2, an email dated July 16, 2007 at 6:59 PM. The only parties to this second email are Bruce Hood and his paralegal, Betsy Hall. The subject line reads "FW: Declaration of Trust." In the email, Ms. Hall gives her opinion on the changes to the Trust that Daniel Birmann requests in his July 13, 2007 email. Ms. Hall states that her opinion is informed by her review of the Trust documents and her review of Cayman Trust Laws that are published on the internet.

The July 16, 2007 email must be produced for the same reason that the July 13, 2007 email must be produced. The July 16, 2007 email discusses Daniel Birmann's assets and his concerns about

solvency at the time of creation of the Trust.  Those facts are sufficiently related to and in furtherance of the Brazilian bankruptcy crimes or fraud that Daniel Birmann more likely than not committed, as discussed above.  Although the July 16, 2007 email is not between a lawyer and his or her client, as discussed earlier, that distinction does not vitiate applicability of the crime-fraud exception. *See In re Warner*, 87 B.R. at 202.

Therefore, and in sum, the Second Motion to Compel is granted with respect to Log Entry 1 and 2, and these documents must be produced.

## Log Entry 13 and 14

These entries consist of two emails dated September 22, 2011, a date well after the Brazilian Court extended the Brazilian Bankruptcy Case to Daniel Birmann.  Both emails relate to the Trust.  The first email, time-stamped 12:52 PM, is from Betsy Hall to Bruce Hood and simply attaches a draft Deed of Exclusion and Designation of Beneficiaries, dated August 16, 2011, that removes Daniel Birmann as the sole beneficiary of the Trust and replaces him with his son, Bernardo, and his mother, Rahma Raquel Benasayang.

This Deed is not new evidence.  The FR already has received an executed copy of the Deed, dated October 3, 2011. [DE #219-9]. The copy attached to this first September 22, 2011 email from Hall

to Hood is not identical, but the differences do not appear to be material.

The second September 22, 2011 email, time-stamped 1:04 PM, is from Bruce Hood to Daniel Birmann and discusses, among other things, the removal of Daniel Birmann as a beneficiary of the Trust. The Court finds that both of the September 22, 2011 emails and the attachment to the first email are sufficiently related to the Trust and in furtherance of Daniel Birmann's likely criminal or fraudulent effort to use the Trust to wrongfully and intentionally conceal and protect his assets. Therefore, the Court is requiring production of these emails under the crime-fraud exception.

<u>Log Entry 36</u>

This entry is a single email dated April 16, 2015 at 8:27 PM, from Bruce Hood to two other Withers' attorneys. The email relates to a financing facility for a Bermudan entity called Anhinga, owned indirectly by Northumbria Corporation, a Panama company. As of the date of this email, Northumbria Corporation was owned by Daniel Birmann's mother, Rahma. However, as of the date of the Brazilian Bankruptcy Decree, Northumbria was owned by Daniel Birmann. *See* CBC Judgment [DE #93, p.12].

The Court finds that this email is sufficiently related to and was in furtherance of Daniel Birmann's efforts to use the Trust to conceal and protect his assets and, therefore, it must be

produced under the crime-fraud exception.  Among other things, the timing of the email was just a month after Daniel's sister, Miriam, became the sole beneficiary of the Trust and this material change to the Trust is discussed in this email.

### Log Entry 43

This entry is a single email dated July 1, 2016 at 3:58 PM with a subject line reading "[W-US.FID332097]" from Bruce Hood to Daniel Birmann asking Daniel Birmann who should get the shares in "N" (presumably Northumbria).  Although this email is more than a year after all the Trust assets were transferred to Miriam, Daniel Birmann's sister, the ownership and change of ownership of Northumbria is sufficiently related to and in furtherance of the fraudulent scheme and, therefore, must be produced under the crime-fraud exception.  Prior to the creation of the Trust, Northumbria was owned by Daniel Birmann and Northumbria was the ultimate owner of the CBC shares eventually subject of the CBC Judgment. *See* CBC Judgment [DE #93, p.12].

### Log Entry 45

This entry is a single email dated November 30, 2017 at 9:31 PM from Bruce Hood to Daniel Birmann with a subject line reading "[W-US.FID334028]."  This email relates to immigration advice. Any connection to the fraudulent scheme is speculative.  Thus, the Court finds that the crime-fraud exception does not apply and, therefore, this email is protected from disclosure.

<u>Log Entry 46</u>

This entry is a single email dated November 12, 2018 at 8:37 PM with a subject line reading "Northumbria [W-US.FID332097]" sent by Bruce Hood to Daniel Birmann.  The email contains a chronology of changes in ownership in Northumbria.  This email was shortly after the Brazilian Court entered its October 31, 2018 preliminary injunction regarding the CBC shares.  The email may not be privileged at all because it does not provide legal advice.  However, assuming it is privileged, the Court finds that it is sufficiently related to and in furtherance of the fraudulent scheme and, therefore, must be produced under the crime-fraud exception.

<u>Log Entry 47</u>

This entry is an email dated November 16, 2018 at 8:47 PM with a subject line reding "Brookmont Share Ownership [W-US.FID332097]" from Bruce Hood to Daniel Birmann, four days after the email in Log Entry 46.  The email discusses ownership of Northumbria and suggests certain alternatives regarding the characterization of Northumbria's ownership of shares in Brookmont.  In the CBC Judgment, the Brazilian Court stated that "it was proven that behind a complex corporate chain, Daniel Birmann held the corporate control of [CBC] at the time of the bankruptcy, since in the end he held all the capital stock of Northumbria Corporation, which is at the top of the pyramid of the corporate chain that owned the shares of CBC." DE #93, p.12.

Brookmont was in this chain.  At the time of the bankruptcy, Daniel Birmann, through Northumbria, owned all the Brookmont shares. *Id*. In 2010, as part of the fraudulent scheme to divest himself of ownership of the CBC shares, Daniel Birmann donated the Brookmont shares to the Trust.[18]   The subject matter of this email is sufficiently related to and in furtherance of the fraudulent scheme and, therefore, must be produced under the crime-fraud exception.

<u>Wiggin No. 0121-122</u>

This entry has five emails but two have already been produced. The three at issue include one sent by Bruce Hood to Daniel Birmann on October 25, 2012 at 3:06 PM, and one sent later that day at 5:18 PM by Daniel Birmann to Bruce Hood in response.  These two emails relate to the Trust, are sufficiently related to and in furtherance of the fraudulent scheme and, therefore, must be produced under the crime-fraud exception.  The third email at issue was sent by Daniel Birmann to Bruce Hood, with copy to Betsy Hall, that same day at 7:39 AM, but the subject of this email is not sufficiently related to the fraudulent scheme and, therefore, this email is protected from disclosure.

---

[18] *See* Deeds of Trust dated August 16, 2010 [DE #219-8].  Daniel Birmann signed the Deeds as Donor and Betsy Hall, Bruce Hood's paralegal, signed as a witness. The transfer of the Brookmont stock into the Trust is also referred to in the CBC Judgment [DE #93, p.12].

## Wiggin 0197-204

This entry contains several emails, but only three have been withheld, all dated September 17, 2007.  The first is from Bruce Hood to Betsy Hall dated September 17, 2007 at 10:56 AM, the second is from Betsy Hall to Daniel Birmann dated September 17, 2007 at 12:08 PM, and the third is Daniel Birmann's response to Betsy Hall dated September 17, 2007 at 7:57 PM.  All involve the Trust, are sufficiently related to and in furtherance of the fraudulent scheme and must be produced under the crime-fraud exception.

## Wiggin 0255-60

Like the emails in Wiggin 0197-204 discussed in the preceding paragraph, the emails at issue in this entry, dated July 26, 2007, by and between Bruce Head, Daniel Birmann and Betsy Hall, also address Trust issues, fall within the crime-fraud exception, and must be produced.

## Wiggin No. 0266-267

This entry is a chain of four emails sent on March 27, 2013, initiated by an email from Citibank to Betsy Hall requesting information about Anaconda Group, LLC and Northumbria Corporation and requesting information about certain transfers of funds from Anaconda to Northumbria.  The initial email from Citibank to Hall is not privileged and has been produced.  The Court finds that the subsequent communications between Hall and Daniel Biermann are sufficiently related to and in furtherance of the fraudulent scheme

38

and the Court is requiring production under the crime-fraud
exception.  These emails discuss ownership issues and specifically
reference the Trust.

### Withers 0742-762

This entry contains twenty-nine emails sent in May, June, and
July 2015.  Bruce Hood has produced all of these emails but five
were produced with redactions.

The five emails at issue are all emails between attorneys at
Withers or between Bruce Hood and Brazilian counsel, who it appears
were representing Daniel Birmann, members of his family or Birmann-
related entities.  Although these emails occurred during the same
time period as some of the above-described emails relating to the
Trust, the Court rejects, as too speculative, the FR's argument
that these emails are sufficiently related to and in furtherance
of Daniel Biermann's fraudulent scheme and, therefore, these
emails are protected from disclosure.

### Withers No. 0789

This entry contains two internal emails between two Withers'
attorneys on June 9, 2016 and June 13, 2016.  The subject of these
emails is a transaction not sufficiently related to or in
furtherance of the fraudulent scheme to come within the crime-
fraud exception and, therefore, the emails are protected from
disclosure.

## Conclusion

At the end of his opinion in *Eastman I*, U.S. District Judge David O. Carter stated that "[m]ore than a year after the attack on our Capitol, the public is still searching for accountability. This case cannot provide it." *Eastman I*, 594 F. Supp. 3d at 1198. The District Court explained that it was "tasked only with deciding a dispute over a handful of emails. This is not a criminal prosecution; this is not even a civil liability suit." *Id.*

The Brazilian Case and the pursuit of Daniel Birmann's assets are not comparable to the enormity of the events leading up to the January 6th attack on the U.S. Capitol.  But Judge Carter's comments in *Eastman I* resonate here.  This Order does not find Daniel Birmann guilty of violating Brazilian criminal statutes nor does it adjudicate any fraud or fraudulent transfer civil remedies that the FR is pursuing, or may pursue, against Daniel Birmann or others in the Brazilian Case.  Those determinations must be made in Brazil, if necessary in the FR's pursuit of estate assets.  This Order resolves only a limited discovery dispute in this chapter 15 case between the FR and the Respondents.  For the foregoing reasons, the Court **ORDERS** as follows:

1.    The Second Motion to Compel is granted in part and as detailed herein, the Respondents must produce unredacted copies of the Withheld Documents identified as Log Entries 1, 2, 13, 14, 36, 43, 46 and 47, and Wiggin 0121-122 (except for the email from

Daniel Birmann to Bruce Hood dated October 25, 2012 at 7:39 AM),

Wiggin 0197-204, Wiggin 0255-260 and Wiggin 0266-267.

    2.   The Second Motion to Compel is denied in part and as

detailed herein, the Respondents are not required to produce the

Withheld Documents identified as Log Entry 45, Wiggin 0121-122

(only the email from Daniel Birmann to Bruce Hood dated October

25, 2012 at 7:39 AM), Withers 0742-762, and Withers 0789.

            ###

**COPIES TO:**

Gregory Grossman, Esq.
SEQUOR LAW P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(Counsel for the Foreign Representative)

Nyana Miller, Esq.
SEQUOR LAW P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(Counsel for Foreign Representatives)

James J. Thornton, Esq.
LEWIS BRISBOIS & SMITH LLP
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
(Counsel for interested parties,
Daniel Birmann, Bruce Hood, Esq.
Withers Berman LLP, and Wiggin &
Dana LLP)

Brandon T. White, Esq.
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, FL  33131-2847
(Counsel for interested parties,
Daniel Birmann, Bruce Hood, Esq.
Withers Berman LLP, and Wiggin &
Dana LLP)

Case 18-23941-RAM    Doc 294    Filed 07/26/23    Page 42 of 42

Office of the U.S. Trustee
51 SW First Avenue, Suite 1204
Miami, FL  33130

**CLERK TO SERVE:**

Aaron Javian
Reed Smith LLP
599 Lexington Avenue, 29th Floor
New York, NY 10022-7650
(Counsel for interested parties,
Bruce Hood, Esq., Withers Berman LLP,
and Wiggin & Dana LLP)

Brian T. Phelps
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
(Counsel for interested parties,
Bruce Hood, Esq., Withers Berman LLP,
and Wiggin & Dana LLP)

John C. Scalzo
599 Lexington Ave 22nd FL
New York, NY 10022
(Counsel for interested parties,
Bruce Hood, Esq., Withers Berman LLP,
and Wiggin & Dana LLP)